1
2
3
4
5
6
7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

8

HENRY J.B. DICK, Ph.D.,

9

Plaintiff,

v.

10

UNIVERSITY OF WASHINGTON, an agency
of the State of Washington; and UW Port
Captain Meegan Corcoran; Supervisor Shipboard
Science Support Group Loren Tuttle; and Human
Resources Investigator Joanne Wuitschick,
individually and with their marital communities,
if any;

11
12
13

Defendant(s).

NO.

COMPLAINT FOR DAMAGES

14
15

## I.  NATURE OF THE CASE

16

1.      Henry Dick, Ph.D. is an internationally renowned geophysical scientist with many

17

years' experience gathering rock samples from the ocean floor.  In early 2019, he was Chief

18

Scientist on a cruise which engaged UW personnel and equipment (including the ship RV

Thompson).  The UW personnel did a poor job, and wasted government funds.  Anticipating a bad

19

post-cruise review and because of his gender, the University of Washington and the individual

20

Defendants caused a tortiously inaccurate report to allege that Dr. Dick had created a "hostile

21

working environment" for a female technician, among other false claims, then published that report

22

to Dr. Dick's employer and others.  These actions were discriminatory on the basis of gender,

23

COMPLAINT FOR DAMAGES - 1

retaliatory and taken under color of law and in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq, and were defamatory and interfered with Dr. Dick's relationship with his employer, the Woods Hole Oceanographic Institute.

## II.   PARTIES JURISDICTION, AND VENUE

2.      Plaintiff Henry J.B. Dick, Ph.D. is a resident of Massachusetts.

3.      Defendant University of Washington is an arm of the State of Washington, doing business in King County.

4.      Plaintiff has complied with RCW 4.92.100.

5.      Defendant Meegan Corcoran is an employee of the Defendant University of Washington, School of Oceanography.   On information and belief she is employed in Seattle, Washington and was employed as the shore-based Port Captain for the cruise in question.

6.      Loren Tuttle, Supervisor Shipboard Science Support Group is an employee of the Defendant University of Washington, employed in Seattle, Washington.

7.      JoAnne Wuitschick is a Human Resources Consultant employee of the Defendant University of Washington, employed in Seattle, Washington responsible for the investigation of Dr. Dick.

8.      The Court has jurisdiction over the matter pursuant to RCW 2.08.010.

9.      Venue is proper in this Court under RCW 4.12.025 because one or more Defendants transacted business in King County and some of the events that gave rise to Plaintiff's causes of action occurred in King County, Washington.

## III.    RELEVANT FACTS

10.      Henry Dick, Ph.D. is a 74 year old man who is a leading authority on exploration and research of the Earth's upper mantle and ocean crust.

11.      At relevant times, Dr. Dick has been employed as a Senior Scientist with Tenure at the Woods Hole Oceanographic Institute ("WHOI").

COMPLAINT FOR DAMAGES - 2

12.     His career has focused on the relationship between the Earth's mantle flow, melting and tectonics in ocean ridges.  A critical component of Dr. Dick's research relies on participating and leading ocean research cruises. The purpose of these cruises is to collect data and survey the ocean floor.

13.     Dr. Dick's primary source of funding for ocean research cruises is the National Science Foundation ("NSF"). The NSF is an independent federal agency created by Congress in 1950 to, among other things, promote the progress of science.

14.     Dr. Dick's relationship with the NSF is extremely important given its role in funding for his scientific research.  He has been a recipient of NSF funding, and has been in good standing with the NSF since 1976.

15.     Prior to the Cruise (referenced below), and over the course of his career, Dr. Dick has been chief scientist or co-chief scientist of fifteen ocean research cruises.  Additionally, he has been a member of the science party on sixteen other ocean research cruises.  He is aware of no significant interpersonal or other management complaints related to those prior cruises.

16.     Dr. Dick was the Chief Scientist on a scientific research cruise in the Indian Ocean that took place between February 21, 2019 and March 28, 2019 (hereinafter referred to as the "Cruise" or the "Marion Rise Cruise") aboard the research vessel "RV Thomas G Thompson" ( hereinafter "RV Thompson").

17.     The Cruise was funded by the NSF through a ship operations grant and cooperative agreement with the University of Washington's ("UW") School of Oceanography along with other sources, including WHOI, and was intended to map and sample the ocean floor in an area known as the Marion Rise, in the southern Indian Ocean.

18.     The RV Thompson was scheduled for the Cruise under an arrangement with University-National Oceanographic Laboratory System ("UNOLS"). UNOLS is an organization

COMPLAINT FOR DAMAGES - 3

of 59 academic institutions and National Laboratories involved in oceanographic research and joined for the purpose of coordinating oceanographic ships' schedules and research facilities.

19.    The Cruise had three primary elements/goals: 1) a multibeam, magnetics, and gravity survey taking roughly 50% of the science time; 2) seafloor sampling using a wire cable and dredge; and 3) Sentry AUV (autonomous underwater vehicle) surveys.

20.    Dr. Dick was the Principal Investigator ("P.I.") for the proposal that led to the Cruise, and Chief Scientist for the expedition. Dr. Masako Tominaga, working for the Deep Submergence Laboratory at WHOI was co-P.I., but did not physically participate in the Cruise herself, sending a student instead.

21.    Dr. Tominaga did coordinate mobilization of the Sentry underwater mapping submersible and its deployment to the ship, working with the Sentry team leader Sean Kelley and Kevin P. Kavanagh of the Applied Ocean Physics & Engineering Department at WHOI. WHOI Senior Scientist Maurice Tivey, Ph.D. was designated Senior Geophysicist and ran the geophysical survey at sea on the RV Thompson.  He coordinated with Senior Scientist Emeritus Dan Fornari, PhD of WHOI in locating and shipping the geophysics gear to the ship.  The remaining senior individuals of the Scientific Party were German Co-Chief Scientist, Professor Juergen Koepke PhD, and Chinese Co-Chief Scientist Professor Huaiyang Zhou, PhD, and Senior Outreach Officer Professor Michael Cheadle, PhD.

22.    Planning for the Cruise began in 2018. As Chief Scientist, Dr. Dick's primary pre-cruise logistics/planning responsibilities were obtaining, organizing and preparing for shipment of the rock dredging equipment, and curatorial supplies for shipboard rock description and imaging. Dr. Dick was also responsible for planning the geophysical survey track of the Cruise and locating the dredging sites (which would need to be updated and/or narrowed based on the geophysical mapping done on the first half of the Cruise).

COMPLAINT FOR DAMAGES - 4

23. While planning the Cruise, Dr. Dick was in regular communication with the senior members of the Scientific Party, representatives from the NSF and UNOLS, and UW employees including but not limited to Port Captain Meegan Corcoran, Manager of Marine Operations Douglas Russell, Supervisor of the Shipboard Science Support Group Loren Tuttle, and Administrative Assistant Su Tipple (collectively referred to as "UW Planning Group"). Additionally, dredging technician Justin Smith participated in some pre-cruise planning.

24. Mr. Russell's role involved responsibility, directly or indirectly, for contract or grant oversight or management on the Marion Rise Cruise.

25. Mr. Kamphaus's role involved responsibility, directly or indirectly, for contract or grant oversight or management on the Marion Rise Cruise.

26. Mr. Tuttle's role involved responsibility, directly or indirectly, for contract or grant oversight or management on the Marion Rise Cruise.

27. Ms. Corcoran's role involved responsibility, directly or indirectly, for contract or grant oversight or management on the Marion Rise Cruise.

28. Captain Haroldson's role involved responsibility, directly or indirectly, for contract or grant oversight or management on the Marion Rise Cruise.

29. During pre-cruise planning, Dr. Dick made proposals to the UW Planning Group for how the research would be conducted on the Cruise. A key element of the Cruise was dredging. Dredging is a method used to collect samples from the ocean floor, which samples Dr. Dick would subsequently analyze and study.  Physically, dredging is dragging a bucket or basket (the dredge) across the ocean floor to gather rocks.

30. The Marion Rise is a geographic formation on the bottom of the southern Indian Ocean.  It is located in a place where weather can be rough, and changes rapidly.  Dredging is commonly referred to in the research sailing community as "the one thing you can do in rough weather," and that was the plan.

COMPLAINT FOR DAMAGES - 5

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

31.     Dr. Dick proposed using power dredging on the Cruise (there are various types of dredging) due to anticipated rough weather conditions and rough topography in the area of the southern Indian Ocean where the Cruise would conduct research. Power dredging involves using the ship's main engines to drag the dredge across the ocean floor while controlling the dredge wire tension on the winch.

32.     No objections were raised in any of the meetings where Dr. Dick proposed that the Cruise use power dredging, including the last one, which was attended by Marine Technician Justin Smith.

33.     Marine Technician Sonia Brugger is an employee of the Defendant University of Washington who was employed as marine technician on the cruise in question.

34.     Defendant Tuttle is Brugger's direct supervisor when she is not at sea.

35.     Marine Technician Justin Smith is a Marine Dredging Technician and an employee of Bermuda Institute of Ocean Sciences.   He was employed as a University-National Oceanographic Laboratory System ("UNOLS") pool technician abord the RV Thompson for the 2019 Marion Rise Cruise that is the subject of this lawsuit.

36.     Dr. Dick also informed the UW Planning Group that the WHOI group was bringing six WHOI dredges for the Cruise, in addition to those provided by UW, because it expected to lose half of them due to the risks involved in dredging in the exceptionally rough terrain of the SW Indian Ridge, and due to inclement weather.

37.     The WHOI group needed and had planned to use (and lose) multiple dredges due to conditions in the southern Indian ocean.

38.     No one from the UW Planning Group raised any issue with Dr. Dick's proposal.

39.     Mr. Smith and Ms. Brugger were involved in and/or aware of the planning.

40.     Unfortunately, the UW pre-cruise planning was deficient and disorganized.

41.     The following are examples of poor pre-cruise planning.

COMPLAINT FOR DAMAGES - 6

42.     Just eight days before the Cruise, Dr. Dick learned from RV Thompson Captain Russell DeVaney, with whom he had been corresponding regarding Cruise planning, that Captain Eric Haroldson, and not Captain DeVaney, would be the captain during the Cruise.

43.     Dr. Dick had been working with Captain DeVaney, Port Captain Meegan Corcoran, and other UW staff to plan and prepare for the cruise for some months.

44.     Captain Haroldson did not attend any of the pre-cruise meetings.

45.     Captain Haroldson was not part of the pre-cruise planning process for the Marion Rise Cruise referred to herein.

46.     Captain Haroldson and the UW decided that Captain Haroldson did not need to attend the pre-cruise planning meetings.

47.     As an example of poor pre-cruise planning, the University of Washington failed to get the necessary security clearance in time for the WHOI Potential Fields Pool Equipment ("PFPE") facility to supply an instrument for the cruise.  Dr. Dick contacted the relevant WHOI equipment manager on January 24, 2017 to notify him that the Thompson Cruise was funded, and needed a gravimeter for the geophysical survey.  The manager and Dr. Tominaga arranged a meeting with UW on March 20, 2018 to discuss deployment of a PFPE gravimeter on the Thompson for the Marion Rise Expedition.  Without this key instrument, several of the cruise objectives could not be accomplished.

48.     Transporting this gravimeter internationally requires an International Traffic in Arms Regulations ("ITAR") license.  After the March 20, 2018 meeting, WHOI staff contacted UW 16 times about proceeding with requesting the ITAR license, and expressed concern that UW had not yet submitted the ITAR request.  Ultimately the UW did not obtain the ITAR license.  Had UW submitted the ITAR clearance application in a timely manner, a crisis situation would have been avoided.

COMPLAINT FOR DAMAGES - 7

49.     As a consequence Dr. Dick and Dr. Tominaga (via WHOI staff) were forced to arrange for a gravimeter at the last minute, have it flown from New Zealand to far Western Australia, and installed on the Thompson there before the ship transited to Durban, South Africa where the Marion Rise Cruise originated.  This was a huge inconvenience and incurred additional obligation and expense.

50.     Additionally, despite numerous requests, both verbally and by email, the University of Washington did not properly inform Dr. Dick of a paperwork and planning document (Cruise Plan), which it claims was necessary for the cruise, until January 22, 2019, just four weeks prior to the cruise departure date.

51.     As a consequence Dr. Dick was unaware of the Cruise Plan document, and its specific requirements, and thus missed deadlines necessary for planning the cruise.  The University of Washington had sent this information to Dr. Tominaga, who was not participating on the cruise, on August 29, 2018, but failed to inform Dr. Dick effectively, then blamed him for confusion and delay it had created.

52.     When properly notified, Dr. Dick provided all the necessary information promptly.

53.     During two pre-cruise meetings, the UW agreed to have the manufacturer service the winch used for dredging.  The RV Thompson had not dredged in seven years, and Dr. Dick was concerned that if the winch were not well-maintained, there would be unacceptably low winch speeds, causing delay.

54.     UW, despite agreeing to do so, did not thereafter have the RV Thompson winch serviced before the Marion Rise Cruise.

55.     As a result, on this cruise the maximum winch speed was lowest Dr. Dick had encountered on any vessel he had sailed on in 43 years, at only 40 meters per minute.  Normal winch speeds on UNOLS vessels run between 80 and 65 meters a minute.  If it had been properly serviced, the winch would likely have run at up to double the speed.  When dredging in 3,000

COMPLAINT FOR DAMAGES - 8

meters of water the dredge is raised and lowered 6000 meters.  What should take 80 to 95 minutes with a properly functioning winch takes two and a half hours at a winch speed of 40 meters per minute.  The slow winch speed alone cut the Cruise's capability to dredge by 7 separate dredge drops.

56.     UW did not mention the anticipated slow winch speed at the pre-cruise planning meetings, although this was critical information for creation of the pre-cruise plan.

57.     In preparation for a dredging cruise, UW should also have ensured that the proper equipment was on board for dealing with potential problems with the dredging wire.  Standard tools for handling wire at sea are basic requirements on this type of cruise.  The lack of the proper cutting tool, for example, was foreseeably an issue, and became a necessity on the cruise.  This lack of appropriate planning on the part of UW resulted in a significant loss of ship time, and an otherwise unnecessary time-consuming deck operation to remove damaged wire.

58.     A second incident occurred where a tangle in the trawl wire was found above the dredge during retrieval. The allegedly experienced dredging technician Mr. Smith had never seen this before, though Dr. Dick had seen an experienced Bosun solve the identical problem in approximately 15 minutes in a near gale on a prior cruise.

59.     Dr. Dick tried to explain how the problem could be dealt with, but was informed by Mr. Smith that his advice was not needed.

60.     The Captain, crew and dredging tech took a couple of hours or more to fix the problem, including going to dinner to discuss it, creating an additional delay.

61.     The lack of a Bosun on the UW ships has been a long-standing problem which the UW has refused to address.

62.     Once again, the ship did not have the proper equipment.  This time it lacked proper grips for securing the wire, and borrowed a cable grip from Dr. Tivey which he was otherwise using to secure the magnetometer cable during geophysical surveying.  Using this tool, the crew

COMPLAINT FOR DAMAGES - 9

tried pulling the wire and dredge onto the ship from below the tangle but the tool was not rated for the tension required, and broke during the operation.

63.     Excess wire was coiled on deck at the time of the mishap, which put the dredging technician and crew at serious risk.

64.     Although Captain Haroldson mentioned this incident in his Post Cruise Assessment, he stated that the issue had been safely resolved, failing to mention the misuse of a wire grip, which broke and endangered members of the crew and the dredge technician.

65.     At the outset of the Cruise, Dr. Dick offered to Captain Haroldson to brief the crew on the scientific objectives and methods, but Captain Haroldson declined.

66.     Dr. Dick did give Captain Haroldson a detailed description of power dredging at the initial meeting on the subject when the RV Thompson left port, and then again in a discussion with the Captain attended by Mr. Smith.  The Captain and Mr. Smith, however, insisted on using a different method ("the inchworm").

67.     The UW had failed to inform Dr. Dick that the bow thruster on the Thompson was unusually weak. This had serious impact on the entire cruise, rendering the Captain and Mr. Smith's dredging technique highly inefficient and unsuitable for dredging in rough weather.

68.     While the UW blamed Dr. Dick and claimed the poor coordination with the UW occurred because Port Captain Meegan Corcoran is female, in reality it was UW staff's own poor preparation, poor planning, lack of inter-staff coordination, and poor follow through on its promises that caused these issues.

69.     During research cruises, it is not uncommon to have professional disagreements or for there to be tension from time to time.

70.     During the Cruise, issues arose due to disagreements between Dr. Dick and Mr. Smith over dredging techniques. Despite the fact that Dr. Dick had repeatedly discussed the anticipated power dredging techniques, and the UW Planning Group—including Mr. Smith—had

COMPLAINT FOR DAMAGES - 10

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

been aware of this well in advance of the Cruise, Mr. Smith insisted on using what was termed the "inch-worm" dredging technique by the scientific party, falsely claiming other methods were unsafe and not allowed under the UNOLS safety protocols manual.

71.     No method for dredging was specified in the UNOLS safety manual, as previously no safety issues had been raised about dredging techniques.

72.     The "inch-worm" technique involves dropping the dredge in a specific location, then laying out wire in a specific direction using dynamic positioning, stopping and holding position while the winch is used to drag the dredge across the bottom.

73.     Ordinarily and by custom, the dredging technique used was at the discretion of the chief scientist.

74.     The inch-worm technique was inefficient because of the RV Thompson's weak bow thruster (a propeller system fitted on the bow).

75.     The inch-worm technique could not be performed efficiently in stormy or rough conditions on the RV Thompson because the bow thruster was not powerful enough to hold the ship steady in such conditions.

76.     Based on Dr. Dick's prior ocean cruises, rough conditions were routinely encountered in the southern oceans. Dr. Dick had proposed power dredging before the cruise, and asked again to do it once it became clear the inch worm technique was ineffective in rough weather, and inefficient due to the weak bow thruster.  He also asked to do drift dredging, something he had used on several previous cruises without incident and which would have worked well given the power limitations of the bow thruster.

77.     Both power dredging and drift dredging would have been better techniques for the RV Thompson in view of its weak bow thruster and the difficult weather conditions encountered on the Cruise.

COMPLAINT FOR DAMAGES - 11

78.     Power dredging is a principal method used by the global oceanographic community and is safe.

79.     Dredging is inherently not dangerous.

80.     Mr. Smith and Captain Haroldson insisted on using only the inch-worm technique during the Cruise.

81.     Mr. Smith's allegations that dredging techniques other than the inch-worm method are unsafe are unfounded.

82.     During the Cruise, and after, Mr. Smith could provide no support for his position that power dredging was not safe enough.

83.     Mr. Smith admitted to Dr. Dick that he had never used any other dredging technique besides the inch-worm technique to dredge, and was thus unfamiliar with power dredging or drift dredging.

84.     Mr. Smith had never used any other dredging technique besides the inch-worm technique to dredge.

85.     Mr. Smith was unfamiliar with power dredging or drift dredging.

86.     When Dr. Dick attempted to explain to Mr. Smith why the Cruise should use power dredging (consistent with his proposal in pre-cruise planning) or alternatively drift dredging, Mr. Smith became defiant and resistant to using any other dredging technique. He insisted that any technique other than the inch-worm technique was unsafe, despite the fact that, based on Dr. Dick's experience, power dredging is the most widely used technique in the global oceanographic fleet, and that the Cruise had planned to use power dredging during the pre-cruise meetings.

87.     Captain Haroldson described one such discussion in writing on March 3, 2019: "This afternoon the Chief Scientist wanted to resume dredging, and was a little bit insistent on it. Winds are backing down slowly, but there is a 20-30 foot westerly swell that doesn't seem to want

COMPLAINT FOR DAMAGES - 12

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

to diminish. After a couple hours off [sic] debate between myself and the Chief Scientist we were at bit of deadlock. Justin Smith, myself, and the Chief Scientist did manage to reach a solution."

88.     Although Dr. Dick pointed out to Captain Haroldson that he had previously and routinely used power and drift dredging under worse conditions safely and successfully, Captain Haroldson refused to allow either.

89.     Captain Haroldson explained that he did not want to lose any equipment.

90.     Given the wasted National Science Foundation (government) resources, and other wasted resources, Dr. Dick was concerned, and advocated for the use of power dredging.

91.     Due to the insistence of the Captain and Mr. Smith on the inch-worm technique, and the weather limitations placed on the dredging program by the captain, the original cruise plan had to be abandoned, which plan would have allowed all dredging to follow the geophysical survey.

92.     A new cruise plan had to be developed.  This was very difficult to do, particularly as weather in the southern Indian Ocean is inherently unstable and difficult to predict, and it forced the chief scientist to use a very inefficient method of dredging, with dredging sites chosen on the fly with insufficient information for prioritizing them.

93.     The time-consuming manner in which Mr. Smith and Captain Haroldson insisted on dredging, and their refusal to operate in rough weather, lowered dredging efficiency on the Cruise, resulting in a loss of about half of the anticipated successful dredge hauls.

94.     The insistence by Mr. Smith to use the inch-worm dredging technique, and the Captain's reluctance to dredge in rough weather, caused substantial and costly delays which prevented the science party from achieving the Cruise's principle objectives.

95.     Based on the science log kept by the science watch, which provides a record of how time was spent each day, the calculated loss of time due to the inefficient style of dredging led to a loss of approximately seven 24-hour days of ship time due to inefficiency. This loss of ship time

COMPLAINT FOR DAMAGES - 13

is equivalent to approximately $45,000 per day and $35,000 per day for fielding the scientific party, for a total loss of approximately $560,000.

96.  The crew on the Cruise had little experience with dredging.

97.  The crew's lack of experience with dredging caused issues on the Cruise.

98.  Justin Smith had little experience with dredging.

99.  Justin Smith's lack of experience with dredging caused issues on the Cruise.

100.  At times during the Cruise, Mr. Smith was outwardly hostile to Dr. Dick, raised his voice at him, and was unwilling to cooperate with him. When Dr, Dick proposed trying drift dredging in relatively calm seas, when there could be no conceivable risk, Mr. Smith refused to consider it or discuss it further.

101.  When Dr. Dick was trying to explain the value of learning more than one dredging technique, Mr. Smith raised his voice at Dr. Dick, although Dr. Dick did not respond in kind.

102.  On one occasion during the Cruise, Mr. Smith stood up at his desk in front of Dr. Dick and loudly mocked him by imitating him stating "I have done this before," repeatedly in a whining voice.

103.  Other Marine Technicians and Dr. Dick's colleagues in the science party were present and observed Mr. Smith's behavior.

104.  Mr. Smith's behavior was offensive and embarrassing to Dr. Dick.

105.  At one point during the Cruise, in the early morning, Dr. Dick went to the science operations center (or computer lab) of the RV Thompson to find out about the status of dredging operations that were scheduled to begin that morning. Dr. Dick spoke with Marine Technician Sonia Brugger and asked why the dredging had not started yet despite the fact that the ship had arrived at the location specified for the dredging an hour early.

106.  Ms. Brugger stated that she had not woken up Marine Technician Justin Smith to commence dredging because it was not scheduled to begin for another hour. Dr. Dick explained to

COMPLAINT FOR DAMAGES - 14

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

Ms. Brugger that the start time was merely an estimated time of arrival, and that dredging should have begun as soon as the Cruise reached the dredging location, particularly given all the time lost on the Cruise to that point.

107.    When Dr. Dick tried to explain to her the normal routine for such operations, Ms. Brugger curtly replied that "this is how we do it on the Thompson."

108.    The RV Thompson had not dredged in over seven years.

109.    When Dr. Dick tried again to explain, Ms. Brugger vehemently disagreed with him, became angry, and told him if he did not like it he should go speak with the Captain.

110.    Ms. Brugger's unwillingness to discuss this with Dr. Dick and/or convey Dr. Dick's position to the Captain was in direct contradiction to the Captain's Sailing Orders which stated that the Marine Technician's responsibilities included "assisting the science party to communicate their procedures, missions and goals" to the Captain.

111.    The Captain's Sailing Orders stated that the Marine Technician's responsibilities included "assisting the science party to communicate their procedures, missions and goals" to the Captain.

112.    On another occasion during the Cruise, Dr. Dick stepped under some plastic warning tape on the deck in order to take pictures of an albatross that had landed in the water close to the ship's stern.

113.    Dr. Dick snapped two or three quick photos, and returned back under the tape in less than two minutes.

114.    The tape was up to prevent personnel from walking on deck when the dredge was on-bottom and the wire was under tension, and was left up because the Captain did not want science personnel on deck when the crew were trying to land the dredge on the deck when it was at the surface.

COMPLAINT FOR DAMAGES - 15

115.     Raising the dredge from the bottom at 3000 feet takes at least a half hour to one and a half hours (and sometimes as long as two and a half hours) before it reached the surface.  Dr. Dick was aware that he was in no danger as there was approximately 600 meters of wire out, so the dredge was in midwater, as indicated by the LED display in the aft hanger.

116.     When the dredge is in mid water, it is not under sufficient tension to be dangerous.

117.     At that time, the ocean was calm, and the crew would not be attempting to land the dredge on the deck for another 15 minutes or more.

118.     As Dr. Dick turned to go back behind the tape after taking photos, he saw Ms. Brugger walk from the hanger across the deck to the aft of the ship.  She did not look at him.

119.     As he proceeded back to the tape Ms. Brugger turned and yelled at him disrespectfully to get off the deck. Dr. Dick complied, but responded back to her that there was no safety issues with him being there at that time. Ms. Brugger nevertheless came up to him after he had left the taped-off area and began to berate him.

120.     In response Dr. Dick repeated that there was no safety issue based on his many years of experience with dredging, and stated that the Captain was going to get a negative cruise report for the constraints he had put on the dredging program. While Dr. Dick responded in a firm tone of voice to defend himself, he did not "yell" at Ms. Brugger (in fact, he had been injured due to a fall earlier that morning, and was hardly in a state to be aggressive in any way).

121.     On March 11, 2019 in an e-mail, Captain Haroldson described the interaction as Dr. Dick becoming "a little agitated."   He did not describe the interaction as hostile or inappropriate.

122.     Concerned about his side of the conflict, Dr. Dick attempted to "mend fences."  At lunch, he went to Ms. Brugger and apologized, and later left chocolate on Ms. Brugger's workspace on two occasions (she was not there when he did so).  He left the same chocolate for

COMPLAINT FOR DAMAGES - 16

one of the cooks on one occasion, and for all the science watch, including Mr. Smith and Mr. Jalickee on another occasion.

123.    He also complemented Ms. Brugger on her work, such as when she skillfully raised and lowered a heavy communications pole.  In fact, he had specifically gone to watch this operation because the Sentry party had complained about the inefficiency of this operation, and he wanted to verify whether this was reasonable.  In fact, Dr. Dick concluded this was not the case, which is why he complimented Ms. Brugger.

124.    Nevertheless, it was too late.  When Dr. Dick under stress both of a fractured rib and the impending failure of the dredge program and consequent waste of government funds, told Ms. Brugger that the Captain would be getting a negative post-cruise assessment during the incident on deck, the Crew of the RV Thompson turned against him and manufactured false claims of improper conduct.

125.    The choice to falsely claim he had created a gender-based hostile working environment for Ms. Brugger occurred because of Dr. Dick's gender, male.

126.    Indeed, Mr. Smith sent an email during the Cruise about Dr. Dick to a friend (who was not on the Cruise) in which he referred to Dr. Dick as a "F***ing dick."  He said "In fact his sirname [sic] is Dickey and very fitting!"

127.    Mr. Smith also made seemingly ageist comments about Dr. Dick in emails. He referred to Dr. Dick as a "curmudgeon," and made disparaging references to him preferring to use techniques from 40 years ago which are no longer implemented in "this day and age."

128.    Mr. Smith then endorsed a co-worker's words: "Steve [Mr. Jalickee] nicely said" that Dr. Dick's support of allegedly antiquated dredging was akin to "50 years ago black people sat at the back of the bus and women couldn't vote – that still doesn't make it right."

129.    Although the University of Washington is aware of these gender- and age-based slurs, it has taken no action in reference to Mr. Smith's discriminatory references.

COMPLAINT FOR DAMAGES - 17

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

1

2        130.    Shortly after Ms. Brugger inappropriately yelled at Dr. Dick for being on the deck

3    and he subsequently informed her about his intent to give the Cruise a negative review, the crew

4    of the RV Thompson and University of Washington employees put the wheels in motion to

     manufacture an unfounded negative assessment of Dr. Dick.

5        131.    On or about March 10, 2019 Ms. Brugger wrote to Loren Tuttle, Supervisor,

6    Shipboard Science Support Group, University of Washington.  Mr. Tuttle was not on the Cruise.

7    Ms. Brugger indicated Dr. Dick had informed her that he plans on submitting a report to UNOLS

8    about "our horrible conduct and how the ship does not operate properly."  Mr. Tuttle responded,

     asking Ms. Brugger to make note of any negative or derogatory comments from the science party.

9        132.    From this point forward, the crew of the RV Thompson, and the University of

10   Washington support team, engaged in a concerted effort against Dr. Dick.  Mr. Tuttle, for example,

11   took Ms. Brugger's side immediately, although he acknowledged that he was ignorant of specifics,

12   he said "I'm sorry that you were the target of his disrespect."  Mr. Tuttle made no effort to discuss

13   the matter with Dr. Dick and hear his side of the story.

14       133.    Ms. Brugger later variously claimed 1) things were better after a conversation

15   between them and Captain Haroldson, 2) that Dr. Dick was acting friendly and trying to get to

16   know her and had left chocolate for her, 3) that he ignored her after the conversation with Captain

     Haroldson, and 4) at the same time, gave her angry looks.

17       134.    Ms. Brugger's version of events in reference to the conflict over dredging start time

18   is also demonstrably false.  For example, she claimed that the plan for the Cruise on March 4,

19   2019, agreed upon by Dr. Dick along with Captain Haroldson, Mr. Smith, and Mr. Jalickee, was

20   to start dredging at 4:00 a.m.  In reality, the 4:00 a.m. time was merely an estimated time of arrival,

     and the plan was to dredge upon reaching the site.

21       135.    Ms. Brugger's action in delaying the start of dredging wasted valuable ship time.

22

23

COMPLAINT FOR DAMAGES - 18

136.   Ms. Brugger went on to claim that the RV Thompson "arrived at dredge site 30 minutes early after pulling up the magnetometer." In fact, the RV Thompson arrived on station at 3:00 AM and the dredge did not get into the water until 4:21 a.m. (per the watch standers' records). In other words Ms. Brugger minimized the time wasted by her actions, which was at least an hour. Based on the average time for deployment of the remaining dredges this amounted to about $8,000 worth of ship time.

137.   Another example of Ms. Brugger's efforts to negatively characterize Dr. Dick occurred with regard to Ms. Brugger's description of the incident that took place between her and Dr. Dick on the deck. Ms. Brugger claimed that she saw Dr. Dick duck under the safety line, and called the bridge on her radio prior to asking him to leave because she was allegedly not comfortable with not having another crew member present given how allegedly aggressive Dr. Dick had been to her.

138.   Third Mate Schwartz's post Cruise statement contradicts Ms. Brugger's statement. Third Mate Schwartz stated that he and Able Seaman Hansen were the ones who noticed Dr. Dick on the deck (not Ms. Brugger) and radioed Ms. Brugger to ask Dr. Dick to leave the deck.

139.   Because there was no deck operation going on at the time, Dr. Dick did not need protective gear and was in no danger.

140.   On March 26, 2019, Dr. Dick disclosed to Douglas Russell, UW Manager of Marine Operations, evidence that there was a gross mismanagement of a federal contract and/or a gross waste of Federal funds on the Marion Rise Cruise.

141.   Later, Port Captain Meegan Corcoran, who was not on the Cruise, took over University of Washington's concerted efforts to paint Dr. Dick in an unfair negative light in response to his negative assessment of the Cruise.

COMPLAINT FOR DAMAGES - 19

142.   On April 1, 2019, by email, Meegan Corcoran asked Justin Smith to create documentation to "paint the picture of what really happened out here since Henry has been very vocal to NSF."

143.   Although she was a witness to the allegations, and an initiator of the plan to respond to Dr. Dick's communications to NSF, *and* initiated the documentation-gathering, the University of Washington allowed Ms. Corcoran to play an investigator role as well, including helping edit the final investigation report.

144.   Agents of the University of Washington School of Oceanography claim they raised the issue to UW Human Resources because members of the crew complained about Dr. Dick, but in reality the investigation did not begin until after Dr. Dick communicated to James Austin of the UNOLS Fleet Improvement Committee about the deficiencies of the Captain and crew, including inexperience at dredging.

145.   The University of Washington assigned a Human Resources employee, Joanne Wuitschick, as investigator.

146.   Ms. Corcoran was the person who requested written comments from all crew members.

147.   These requests were made with leading comments, and were intended to solicit negative responses.

148.   Many of the crew provided no negative statement about Dr. Dick.  No further investigation was conducted for these crew members.

149.   The UW did not follow up with crew members who did not initially provide negative statements about Dr. Dick to determine why they had not done so.

150.   Upon information and belief, Ms. Wuitschick, with the assistance of Ms. Corcoran, collected and reviewed fifteen written statements from UW employees and/or contractors, and conducted a single interview, with Ms. Sonia Brugger.

COMPLAINT FOR DAMAGES - 20

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

151.   At no point did UW attempt to contact Dr. Dick during its investigation.

152.   Ms. Wuitschick never spoke with or asked for any statement from Dr. Dick during her investigation, and he had no input, so his side of the story was not considered.

153.   The UW did not receive Dr. Dick's perspective on the conflicts on the Cruise.

154.   The UW did not seek a statement, testimony, or input from Dr. Dick during its investigation.

155.   UW did not interview a single scientist about Dr. Dick's actions.

156.   Numerous scientists have since provided letters of support for Dr. Dick stating that he behaved appropriately at all times, and that other than the dredge operations, which were universally disappointing to the experienced scientists on the cruise, that the scientific operations were exceptionally well run.

157.   The University did not seek to interview or obtain input from numerous additional witnesses or interview those who did not voluntarily respond to Ms. Corcoran's negatively-loaded request for statements.

158.   The University did not investigate the behavior of Justin Smith, who was unprofessional towards Dr. Dick because of his gender and age, as shown by documents that were obtained by UW during the course of its investigation.

159.   Dr. Dick was respectful and polite to crew members despite the disagreements on the Cruise regarding the best dredging techniques, and numerous members of the Scientific Party would have so informed the UW investigation, if they had been asked.

160.   Ms. Wuitschick drafted an investigation report, with input from others.

161.   The UW investigation Report  ("UW Report") is dated May 22, 2019.

162.   The Report was transmitted to WHOI.

163.   The Report was transmitted to representatives of the National Science Foundation.

164.   The Report was transmitted to representatives of the UNOLS.

COMPLAINT FOR DAMAGES - 21

165.    The Report is a public record of the University of Washington, available to anyone who requests it.

166.    The findings of UW investigation include (falsely) that "on multiple occasions on this cruise, Dr. Dick engaged in behavior that was disrespectful, unprofessional and showed disregard for the Captain's authority and safety protocols. Dr. Dick created a hostile work environment through his verbal conduct and insistent behavior. Further, on more than one occasion he engaged in disrespectful behavior directed at a female MT that appeared to be based on her gender…."

167.    In making the conclusion of gender bias, the UW report ignores exculpatory facts.

168.    Dr. Dick's efforts to "mend fences," apologize to Ms. Brugger for the conflict, and compliment her when she did a good job, was used as a further basis to claim he created a hostile working environment towards her based on gender when she rejected his apology.

169.    Dr. Dick's apology, attempt to "mend fences" with a small gift of chocolate, and compliment on Ms. Brugger's competent conduct with the communications pole were not gender-based elements of any hostile work environment

170.    Dr. Dick's apology came after a request by Captain Haroldson for said apology.

171.    The UW report also baselessly alleges or implies that poor communication with Port Captain Meegan Corcoran was due to her gender.

172.    In interactions with the UW, Dr. Dick was never given an opportunity to respond to the allegations, review the witness statements taken by UW, or respond to the findings in the UW Report.

173.    Ms. Wuitschick has authority to address alleged discrimination and through her office to initiate corrective measures.

174.    Rather than correcting discrimination against Dr. Dick, Ms. Wuitschick participated in it.

COMPLAINT FOR DAMAGES - 22

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

175.     Prior to finalizing the UW report, Ms. Wuitschick solicited input and modification on the Report from two of UW's witnesses, Ms. Corcoran and Mr. Tuttle (neither of whom were on the Cruise but both of whom helped gather evidence against Dr. Dick).

176.     Among other things, Ms. Corcoran demonstrated her bias against Dr. Dick by intimating in her comments to the UW Report that Dr. Dick should be banned from sailing again on a UW vessel.

177.     Ms. Corcoran was allowed to review and comment on the UW Report prior to its finalization.

178.     The draft of the UW Report was also reviewed by Robert Kamphaus, Manager of Marine Operations at UW School of Oceanography.

179.     Mr. Kamphaus did not attend the Cruise and had no first-hand knowledge of the events.

180.     Despite not having any first-hand knowledge whatsoever, he urged Ms. Wuitschick to include a reference in the UW Report that Dr. Dick engaged in a hostile manner.

181.     In response, Ms. Wuitschick added the following to the UW Report: "Dr. Dick created a hostile work environment through his verbal conduct and insistent behavior."

182.     The reference to a hostile work environment was not in Ms. Wuitschick's original draft of the UW Report, yet a UW employee who was not on the Cruise, directed that conclusion to be included in the Report, after he was aware that Dr. Dick complained about waste of NSF funds.

183.     Mr. Tuttle subsequently reviewed the draft of the UW Report on Mr. Kamphaus' computer, evidencing UW's concerted team approach to attempting to paint Dr. Dick in the most negative light possible.

184.     The UW also coordinated with WHOI Human Resources representatives while producing the report.

COMPLAINT FOR DAMAGES - 23

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

185.     Instead of allowing Dr. Dick an opportunity to participate in the UW investigation, UW sent the report to Dr. Dick's employer (WHOI), knowing it was foreseeable that it would interfere with the relationship between them.

186.     The UW report is one-sided and unreliable.

187.     University of Washington asserts that its report is thorough, fair, and accurate.

188.     UW sent the Report to WHOI on May 22, 2019, claiming it had conducted a thorough and fair investigation and had determined that Dr. Dick had allegedly, among other things, created a "hostile work environment" through verbal conduct and insistent behavior, and engaged in disrespectful behavior based on gender.

189.     Among other conduct of the Defendants, communication of the false statements to WHOI and others caused damage to Dr. Dick's reputation, income, liberty and property interests, along with emotional distress.

190.     Given the wholly one-sided nature of the UW Investigation and Report, which were completely devoid of any due process for Dr. Dick, and the unsubstantiated nature of allegations contained in the report, it is clear that the UW was retaliating against Dr. Dick for his Cruise reports to UNOLS and the NSF.

191.     Additionally, among other factors, the gender and age-based slurs and other references by Mr. Smith, the origin of the complaints, and the conclusion of gender-based hostile environment without valid basis make it clear that Dr. Dick's gender was a factor in the decision to target him with a "hostile working environment" investigation.

192.     Dr. Dick disclosed to UW management, to WHOI representatives, and to NSF representatives, including those responsible for contract or grant oversight and/or management, evidence of gross mismanagement of a federal contract and/or a gross waste of Federal funds.

193.     It is evidence of the validity of Dr. Dick's claims regarding the limitations put on the dredging program that he requested a replacement cruise from the National Science

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

Foundation, providing representatives of the NSF with information, and later with detailed documentation on the dredging operations on the Thompson and response NSF offered him $100,000 supplement to his original grant to participate on a forthcoming similar cruise and, in the alternative, allowed him to submit a new grant proposal.  Though the historic success rate of such proposals is less than 50% (upon information and belief it is in the 10% - 15% range), the NSF funded this proposal with $297,889, sufficient for the full US scientific party to participate in the forthcoming cruise, though the scope of the second cruise did not allow for the original full scientific program of the two joint cruises to be completed.

194.    Dr. Dick drafted a Post Cruise Assessment Report ("PCAR"), submitted on April 18, 2019, in which he recommended specific corrective action.  Evidencing the bogus and retaliatory nature of the allegations against Dr. Dick, UW's response to Dr. Dick's PCAR identified multiple Corrective Actions it will take on future cruises, including regarding placement of safety lines (related to the incident on deck with Ms. Brugger and Dr. Dick), purchase of certain equipment that was not on the RV Thompson (one of the issues identified by Dr. Dick), and ensuring pre-cruise planning addressed power needs for equipment (another issue raised by Dr. Dick).

195.    The official UW response to the PCAR contained two Recommendations, and nine Improvement Actions regarding, inter alia, power issues, training for technicians on equipment, improvement by UW Marine operations of pre-cruise planning, and holding mid-cruise meetings. These were all items Dr. Dick appropriately took issue with in his PCAR, and which directly undermine the allegations by the RV Thompson Crew that he was behaving unreasonably when he protested these failures.

196.    The above-referenced facts caused damage to Dr. Dick's emotional state, causing distress, anger, sadness, fear and the like, and caused damage to his reputation, relationship with

COMPLAINT FOR DAMAGES - 25

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

his workplace, standing in the professional community, and standing with UNOLS and the National Science Foundation.

197.    The University of Washington is responsible for the conduct of its employees and agents under the doctrine of Respondeat Superior.

## IV.  CLAIMS

### A. Defamation

198.   The foregoing facts constitute defamation.  The University of Washington acting through its agents including the individual Defendants created a false narrative, communicated false facts to Plaintiff's employer (WHOI) and to the National Science Foundation and others, and thereby placed Plaintiff in a false light, falsely claiming he was misogynist, had created a hostile work environment, was impossible to work with on the Cruise, and that he required training on sexual harassment policies prior to serving on a UW research cruise again (implying he was not fit to serve as a Chief Scientist).  Moreover, they falsely claimed that the problems that arose on the cruise were due to his failure to do proper cruise planning, when in fact the opposite is true, and that he behaved in an unsafe and reckless manner, including inciting mutiny.

199.   Publication of these false statements to third parties caused damages to Plaintiff which are further identified herein.

### B.  Tortious Interference with Business Relationships

200.   The foregoing facts constitute the tort of intentional interference with a business relationship.  Dr. Dick had a valid expectation that his relationships with WHOI and the NSF would continue.  This was known to the individual Defendants and to the University of Washington, but they intentionally interfered with those relationships for improper purposes, causing damage to those relationships and other damages.

COMPLAINT FOR DAMAGES - 26

201.   The intentional interference with Dr. Dick's ongoing relationships was damaged in that, *inter alia*, he has been disciplined by WHOI based on the false narrative causing economic loss, been barred from future leadership positions on oceanographic cruise while working for WHOI, and has had substantial threat of impacts to his relationships with NSF and UNOLS which have indicated that reports of misconduct are considered in future funding decisions, and other damages identified herein.

### C.   Gender Discrimination in Violation of Title IX, 20 U.S.C. § 1681, et seq.

202.   The University of Washington receives federal financial assistance for the RV Thompson and received it for the Marion Rise Cruise.

203.   Defendants, including the University of Washington, subjected Dr. Dick to discrimination, excluded him from participation in future cruises without mandated remedial training, and deprived Dr. Dick of the equal benefits of participation in educational activities associated with the Cruise, because of his gender.

204.   The above-referenced facts caused damage to, *inter alia*, his reputation, income, liberty and property interests and emotional and mental state as well as other damages.  Moreover, this resulted in his being barred from future leadership positions on oceanographic cruise while working for his current employer, WHOI, which is an educational institution receiving federal funds.

### D.   Gender Discrimination in Violation of RCW Chapter 49.60

205.   The Defendants constructed a false narrative and communicated it to WHOI and NSF in order to damage Dr. Dick in significant or substantial part because of his gender, male.  He was also thereby deprived of the exercise of rights and proper privileges, including engaging in commerce, science, and the full enjoyment of accommodations, advantages, facilities, and

COMPLAINT FOR DAMAGES - 27

privileges of the RV Thompson and the University of Washington in planning and supporting his scientific mission, which was paid for by, *inter alia*, a grant he received from the National Science Foundation.

206.   The violations herein have caused damages to Plaintiff which are further identified herein.

**E.   Deprivation of Equal Protection Under Color of Law in Violation of 42 U.S.C. §1983**

207.   Acting under color of law the individual Defendants intentionally deprived Dr. Dick of his constitutionally protected civil rights, including the right to equal protection of the laws regardless of his gender, race, and age and the right to communicate his beliefs that the UW and crew of the RV Thompson had wasted government funds and to oppose said waste.

208.   The violations herein have caused damages to Plaintiff which are further identified herein.

**F.   Deprivation of Due Process Under Color of Law in Violation of 42 U.S.C. §1983**

209.   The University of Washington and the individual defendants have deprived Plaintiff of his liberty interests without due process of law by publishing to his employer a one-sided review which failed to allow him notice of the charges and the opportunity to be heard by an impartial decisionmaker before stigmatizing publications were made to WHOI and publicly, force self-publication, and that are available, in the public records of the University of Washington and the National Science Foundation, and other branches and arms of government.

210.   The foregoing has caused damages to Plaintiff which are further identified below.

211.   Dr. Dick hereby demands a "name clearing" hearing.

### G.   Other Claims

212.   Defendant has hidden the true reasons for its actions and some of its actions themselves and as a result, Plaintiff reserves the right to conduct discovery into other matters and claims.

COMPLAINT FOR DAMAGES - 28

Plaintiff anticipates adding other claims where appropriate, including for violation of 41 USC §4712 upon exhaustion of administrative remedies.

## V.  REQUEST FOR RELIEF

1.     Plaintiff requests the following relief against Defendants:

    a.    Judgment against the Defendants for general and special damages in an amount to be determined at trial;

    b.    Damages in the form of lost wages and benefits, past and future;

    c.    Damages due to lost earning capacity;

    d.    Compensation for pain and suffering;

    e.    Statutory and reasonable attorney's fees and costs of suit as allowed under law;

    f.    Pre-judgment interest on Plaintiff's lost wages and benefits at the highest rate permitted by law;

    g.    A supplemental award to cover any adverse tax consequences of the judgment;

    h.    Punitive damages as appropriate; and

    i.    Such other relief as the court deems just and equitable, including injunctive relief to prevent further violation of the laws against discrimination.

DATED this 21st day of May, 2021.

Stephen A. Teller, WSBA No. 23372
Attorney for Plaintiff Dr. Henry Dick

COMPLAINT FOR DAMAGES - 29